IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAL ROSEBERRY, W.K.,       )
and J.T.,                     )
                              )
    Plaintiffs,              )   CIVIL ACTION
                              )
v.                            )   FILE NO. _____
                              )
STUDIO 6 DELK ROAD, LLC;      )
LEXICON HOSPITALITY, LLC;     )
LEXICON HOSPITALITY           )
INVESTMENTS, LLC,             )
                              )

    Defendants.

## **COMPLAINT**

COMES NOW Plaintiffs in the above-styled action and file their complaint as follows:

1.

Plaintiffs are victims of sex trafficking at the Motel 6 located at 2360 Delk Road, Marietta, Georgia 30067 ("Motel 6"). W.K. and J.T. are victims of minor sex trafficking at the hotel. Michal Roseberry was trafficked at the motel in 2016. J.T. was trafficked at the motel as a minor, when she was 17 years old, in 2012. J.T. was again trafficked at the motel from 2015–2016. W.K. was trafficked at the hotel as a minor in 2013 and 2014, when she was 15 and 16 years old. Given the nature of the case, Plaintiffs J.T. and W.K. are identified in this complaint by their initials to

1

prevent public disclosure of their names. Plaintiffs' counsel will disclose the full names to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.[1]

2.

Defendant Studio 6 Delk Road, LLC is a Georgia company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent: Richard Evins, 1198 Buckhead Crossing, Suite B, Woodstock, Georgia 30189.

3.

Defendant Studio 6 Delk Road, LLC has been properly served with process in this action.

4.

Jurisdiction and venue are proper as to Defendant Studio 6 Delk Road, LLC.

5.

Defendant Lexicon Hospitality, LLC is a Georgia company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent: Richard

---

[1] Plaintiffs J.T. and W.K. have concurrently filed a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the Complaint, which include the sex trafficking of each Plaintiff. Plaintiffs' anonymity will provide for their own personal safety and will protect Plaintiffs from the public disclosure of details which are intimate and personal in nature.

Evins, 406 Ridley Avenue, Lagrange, Georgia 30240.

6.

Defendant Lexicon Hospitality, LLC has been properly served with process in this action.

7.

Jurisdiction and venue are proper as to Defendant Lexicon Hospitality, LLC.

8.

Defendant Lexicon Hospitality Investments, LLC is a Georgia company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent: Richard Evins, 406 Ridley Avenue, Lagrange, Georgia 30240.

9.

Defendant Lexicon Hospitality Investments, LLC has been properly served with process in this action.

10.

Jurisdiction and venue are proper as to Defendant Lexicon Hospitality Investments, LLC.

11.

At all times herein, Defendants jointly owned, operated, maintained, controlled, managed, and/or were responsible for securing the Motel 6, from which

they benefited financially.

12.

At all times relevant hereto, Defendants owned, operated, maintained, controlled, and managed the Motel 6 as a joint venture, sharing valuable information, data, responsibilities, and financial benefits from the motel's operation, and each having rights of mutual control over the motel and each other.

13.

Any distinctions between Defendants are on paper only. In reality, the three Defendants shared employees, finances, and responsibilities for the operation of the Motel 6. Defendant Studio 6 is ostensibly the landowner, but is wholly controlled by its sole member, Defendant Lexicon Hospitality Investments, which conducts all the business of Defendant Studio 6, including the eventual sale of the property. Defendant Lexicon Hospitality has long advertised its own involvement in operating the Motel 6.[2]

14.

Defendants shared assets, money, employees, office locations, board members, entered into contracts with each other without consideration, had

---

[2] *See* Ex. 1, lexicon-hospitality (Oct. 29, 2019), lexicon-hospitality.com; *see also* http://lexicon-hospitality.com/, Wayback Machine (Jan. 1, 2025, 8:14 AM), https://web.archive.org/web/20200127185504/http://lexicon-hospitality.com/.

employees of one company conduct the business of other companies, and generally ignored the corporate forms that are the hallmark of separate entities.

15.

For the purposes of owning, operating, and managing the Motel 6, during the relevant time, Defendants functioned as a single entity and exercised control jointly over the motel and over each other.

16.

Defendants knew of the rampant sex trafficking and prostitution at the motel for years, before, during, and after Plaintiffs' trafficking. Defendants knew because:

a) the facts of these specific Plaintiffs while they were trafficked for sex at the motel;

b) their employees knew of and permitted sex trafficking and prostitution to occur at the motel;

c) the facts of multiple other sex trafficking victims at the motel before, during, and after Plaintiffs' trafficking;

d) the frequent and ongoing similar crime occurring at the motel;

e) the reports of motel guests to Defendants regarding sex trafficking and prostitution-related activities; and

f) Defendants' knowledge of sex trafficking generally, in the Atlanta area, and at this location specifically.

17.

A person under the age of 18 cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e. "minor sex trafficking") is *criminal* sex trafficking under federal and Georgia law whether the minor had a trafficker/pimp and does not require evidence that the victim was subject to "force, fraud, or coercion." 18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B). Every person who engages in commercial sex with a minor is trafficking that minor under 18 U.S.C. § 1591(a)(1).

18.

Sex trafficking and prostitution were common occurrences at the Motel 6 and Defendants chose to ignore, allow, condone, facilitate, support, and/or permit such activity at the motel. Defendants are liable to Plaintiffs for their actions and failures to act. Defendants' liability to Plaintiffs is straightforward:

a) The Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of" the TVPRA. Defendants knowingly benefited from participation in a venture which they knew or should have known engaged in an act in violation of the TVPRA because

in the operation of the motel, they (i) rented the rooms at the Motel 6 to Plaintiffs' traffickers so that Plaintiffs could be violently sold for sex at the motel; (ii) collected fees for rental of those rooms, and (iii) did so notwithstanding that they knew or should have known that Plaintiffs were victims of sex trafficking at the motel. As such, Defendants are liable to Plaintiffs for their damages under the TVPRA.

b) The Motel 6 constituted both public and private nuisances under Georgia law because the motel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the motel, including rampant prostitution, crimes against women, dangerous illegal activity, drugs, violence, harboring missing and runaway underage girls, harboring wanted felons, sex crimes, and sex trafficking. As a direct result of this nuisance, Plaintiffs were sold for sex at the Motel 6, causing them substantial harm.

c) Because J.T. and W.K. were minors when they were trafficked at the Motel 6, and because Defendants knowingly facilitated their trafficking, Masha's Law, 18 U.S.C. § 2255, provides a civil remedy to J.T. and W.K. for the substantive violation of 18 U.S.C. § 1591.

19.

Whenever reference is made in this complaint to any act, deed, or conduct of Defendants, the allegation is that Defendants engaged in the act, deed, or conduct by

or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendants and the Motel 6.

## I.    Michal's Trafficking at the Motel 6

20.

Michal was trafficked at the Motel 6 from roughly the end of 2015 through March 2016. She was trafficked at the Motel 6 at the same time as J.T. The conditions and circumstances at the Motel 6 during J.T.'s trafficking (and described below) were identical to those experienced by Michal during her trafficking.

21.

Michal was trafficked with other girls at the Motel 6 by a violent trafficker. At times, she shared a room with two other victims, and at times, her trafficker exploited as many as 8 victims at the Motel 6 at once. The girls showed visible signs of abuse, including bruises, split lips, and chunks of hair torn from their scalps. And they often appeared around the hotel in skimpy clothes to attract buyers.

22.

Michal and the other girls were noticeably subservient to the trafficker at the motel. The trafficker frequently made a scene to emphasize his control over the girls at the motel. Michal and the other victims were not permitted to speak in public. When a person came up to them at the motel, the trafficker would come over and

ask what the person wanted. The girls also were not allowed access to phones and had to walk around the motel with their heads down to avoid eye contact with others.

23.

Defendants knew or should have known that Michal was being trafficked based on these signs and behavior.

24.

Michal was sold for sex to roughly 15 men per day while she was at the Motel 6. So were the other two victims in her room. Thus, roughly 45 men visited the single room shared by the victims each day to purchase sex throughout the several months Michal was trafficked at the Motel 6. Defendants knew or should have known that the huge number of men visiting the room each day was indicative of Michal's sex trafficking at the motel. In addition to the dozens of men coming to the rooms to buy sex, the trafficker also sold drugs at the motel, which led to even more foot traffic to the rooms.

25.

Employees at the Motel 6 assisted and facilitated Michal's trafficking by acting as lookouts for the trafficker. They were familiar and friendly with her trafficker. In addition to the facts alleged above, Michal was also seen by an employee in the lobby alongside her trafficker and three or four of his other victims. A comment was made that provoked the trafficker, who then struck Michal in the

face with enough force to draw blood, all in plain view of the front desk employee. The employee locked eyes with Michal before casually telling the trafficker, "Not in the lobby." Rather than intervening or contacting law enforcement, the employee allowed—indeed, encouraged—the trafficker to take his victims back to the room, where he continued to violently assault and sell them for sex to dozens of men each day.

26.

Once, Michal tried to escape her trafficker at the Motel 6 by bolting out of the room in her underwear. The trafficker chased her down in the parking lot and dragged her back to the room, where she was beaten again.

27.

Michal was aware of at least a dozen other girls being sold for sex at the motel while she was there, but also recognized more who she did not interact with. Many of these girls were young and looked to be under the age of 18. She also was aware of at least 5–10 other traffickers at the motel, as well as others she did not interact with.

28.

Housekeeping came to the room and, due to the large number of men buying the victims for sex, found trash cans that were full of more than 40 condoms each day, boxes of condom and bottles of lubricant, multiple girls in underwear or skimpy

clothes, and drug needles and other paraphernalia. Defendants knew or should have known that these signs, among others, were signs of Michal's trafficking at the motel.

## II.    Plaintiff J.T.'s Trafficking at the Motel 6

29.

J.T. was trafficked repeatedly at the Motel 6 during two time periods, in 2012, when she was 17 years old, and again from 2015–2016.

30.

In 2012, when she was 17, J.T. was trafficked for two straight months at the Motel 6 by a trafficker who regularly stayed at the motel.

31.

Later, from 2015–2016, J.T. was trafficked at the Motel 6 again by a different trafficker.

32.

J.T.'s behavior was noticeably subservient to her trafficker around the motel. She was made to keep her head down and not look men in the eyes. Once, she was beaten by her trafficker at the Motel 6 for looking another man in the eyes. Defendants knew or should have known of these signs of the minor and adult sex trafficking victim. J.T. was frequently beaten by her trafficker in and around the Motel 6.

33.

At all times when J.T. was trafficked at the Motel 6, it appeared to her that the majority of the people staying on the property were either girls being sold for sex or those involved in the illegal drug trade. Girls being sold for sex stood outside their rooms wearing very skimpy clothing and walked the parking lot to solicit men to come into the motel to purchase sex. Very often, these girls would be bought for sex that would occur in the parking lot of the motel.

34.

The girls being sold for sex at the motel all wore skimpy clothes, openly advertising their availability for purchase. On average, there were usually at least 25 different girls at the Motel 6 or in the parking lot being sold for sex. Some girls would solicit in the parking lot and then have sex in the parking lot to get money to then pay for a room to rent at the motel.

35.

J.T. witnessed several dozen incidents of traffickers violently beating girls openly in and around the Motel 6. She witnessed dozens of different men trafficking or attempting to traffic the girls being sold for sex at the Motel 6.

36.

Employees at the Motel 6 assisted and facilitated the sex trafficking that was rampant at the Motel 6, including J.T.'s. Housekeepers delivered the extra towels

that J.T. and other victims needed to clean themselves between sex buyers. The employees allowed the trafficking in rooms to continue in exchange for extra tips. J.T.'s trafficker (and at times J.T., at her trafficker's direction), along with other victims and traffickers, regularly paid the housekeepers for their assistance and for enabling the trafficking and not reporting it to authorities.

37.

Front desk employees also allowed the trafficking at the motel, and J.T.'s trafficker paid employees for their assistance. Some front desk staff exchanged rooms at the motel for sex with other sex trafficking victims there.

38.

On June 25, 2016, as a result of the motel's facilitating her sex trafficking, and in addition to the constant sex trafficking, J.T. was raped at the Motel 6.

39.

The widespread commercial sex activity at the Motel 6 attracted a significant number of buyers to the property each day. J.T. estimates that the Motel 6 accommodated more than 100 buyers each day. Defendants knew or should have known that the number of daily, older male visitors to the motel was clearly indicative of sex trafficking and child sex trafficking.

40.

While J.T. was trafficked at the Motel 6, she was made to have sex with

roughly 5 men each day. Defendants knew or should have known that the number of daily, older male visitors to the room was clearly indicative of sex trafficking and child sex trafficking.

### III.    Plaintiff W.K.'s Trafficking at the Motel 6

41.

W.K. was trafficked at the Motel 6 off and on from roughly the summer of 2013 to the end of 2014, when she was 15 and 16 years old. The conditions and circumstances at the Motel 6 during W.K.'s trafficking were the same as those experienced by Michal and J.T., described above.

42.

Employees at the Motel 6 assisted and facilitated W.K.'s trafficking. Hotel housekeepers came into the rooms where W.K. was trafficked and removed trash cans filled with used condoms, saw the teen in skimpy clothing, and observed the cocaine that W.K.'s trafficker left out on tables in the room.

43.

The housekeepers acted as lookouts for the trafficker and permitted W.K.'s trafficking to continue.

44.

Hotel employees also provided rooms to W.K.'s trafficker on credit, allowing payment at a later time. When W.K.'s trafficker did not have the money for the day's

room, the hotel allowed the trafficker to stay in their room without immediate payment, enabling them to sell W.K. and then use the proceeds to cover the cost of the room afterward. In short, the hotel loaned rooms out to traffickers so the hotel could be paid after some illegal money was raised through trafficking in the hotel. Defendants knew or should have known that their employees were facilitating trafficking at the hotel, including W.K.'s trafficking.

45.

When W.K. was trafficked at the Motel 6, she saw many other girls and women who were obviously being sold for sex at the hotel. She was aware of several other traffickers in charge of those girls at the hotel. These women and children wore lingerie and skimpy clothing throughout the hotel and parking lot and there was a constant stream of traffic throughout the day of men with no luggage visiting the hotel rooms of these women and children for short periods of time before leaving and being followed by other anonymous men.

46.

W.K. and other sex trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches wearing very little clothing. Often, these women and children could be seen loitering around the hotel soliciting buyers of sex at the hotel. Defendants knew or should have known that these were signs of sex trafficking at their hotel.

15

47.

While W.K. was trafficked for sex at the Motel 6, she exhibited numerous well-known and visible signs of a child sex trafficking victim, of which Defendants knew or should have known, including her young age and inappropriate appearance, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, loitering, soliciting male patrons, and monitoring and control of W.K. by her trafficker. Defendants knew or should have known that W.K. was being trafficked based on these signs and behavior.

48.

W.K. was sold for sex to more than 10 men per day while she was at the Motel 6. Defendants knew or should have known that the huge number of men visiting the room each day was indicative of W.K.'s sex trafficking at the motel.

## III.    Defendants' Knowledge of Prior Crime at the Motel 6

49.

The Motel 6 was well known for crime, prostitution, and sex trafficking. Defendants had actual and constructive knowledge of criminal activity existing on the property and in the surrounding area prior to Plaintiffs' trafficking.

50.

Defendants directly operated the Motel 6 and employed the employees at the Motel 6, giving them specific and direct knowledge of prior and ongoing crime,

including prostitution and sex trafficking occurring at the motel during that time period.

51.

Prior to Plaintiffs' sex trafficking at Motel 6, prostitution, sex trafficking, and child sex trafficking were rampant and frequent occurrences at the motel, obvious to employees and guests.

52.

Defendants provided a market and beds for sex traffickers to sell women, boys, and girls—including children—to buyers of commercial sex. That is why Plaintiffs' sex traffickers brought Plaintiffs to the Motel 6 to be sold for sex for months.

53.

Defendants maintained a policy or practice of refraining from contacting law enforcement, even when presented with clear indications of criminal activity, including sex trafficking, on its premises. This policy was furthered and reinforced by the actions of Defendants' employees, who, instead of reporting suspicious activities to authorities, took money from traffickers to permit sex trafficking at the Motel 6. This practice created a safe environment for traffickers, including Plaintiffs' traffickers, to exploit their victims.

54.

Prior to Plaintiffs' sex trafficking at the Motel 6, patrons frequently saw women who were being sold for sex at the motel loitering outside, soliciting men for sex, and observed the heavy foot traffic surrounding the rooms where sex and drugs were being sold at the motel.

55.

Defendants knew or should have known of sex trafficking, prostitution, and other criminal activity existing at the Motel 6 prior to Plaintiffs' sex trafficking there.

56.

In addition to all of the above, the police frequently investigated and made arrests for substantially similar instances of criminal activity at the Motel 6. Much of this activity either alerted or should have alerted Defendants to the motel's rampant sex trafficking, prostitution, and sex crime problem. As mere examples, among many other instances, the police responded to the following incidents at the motel before, during, and after Plaintiffs' trafficking:

    i.    On July 13, 2011, a man stole a woman's phone at the Motel 6. It was determined that the woman was engaging in **prostitution** at the motel to support her young child, also living at the hotel.

    ii.    On July 23, 2011, a woman was **raped** at the Motel 6.

iii.  On December 18, 2011, a missing runaway juvenile was found in a room at the Motel 6 with three men armed with guns.

iv.  On January 1, 2012, a man threw a woman's belongings into the hotel parking lot and told police she was a **prostitute** he was "finished" with.

v.  On February 1, 2012, the FBI MATCH task force conducted an undercover operation and arrested a female for **prostitution**.

vi.  On February 10, 2012, a man became belligerent with an alleged **prostitute** and broke a TV in the room.

vii.  On July 3, 2012, a **missing juvenile** reported to police that her mother was attempting to **sell her for sex** at the Motel 6.

viii.  On August 14, 2012, an adult woman was kidnapped at the Motel 6 by two men and a woman who then **trafficked her for sex** around the state.

ix.  On August 16, 2012, the FBI MATCH task force conducted an undercover operation and arrested **three women for prostitution** and a man for pimping at the Motel 6.

x.  On December 9, 2012, a woman was **sexually assaulted** at the Motel 6.

xi.    On January 6, 2013, a woman was arrested for **prostitution** and provided a hotel security guard who was an off-duty police officer with "information on other illegal activity at the hotel."

xii.    Between May 30 and June 1, 2013, a woman was **trafficked for sex** at the Motel 6 and was forced to "hang out in the parking lot looking for sex partners." Her trafficker was ultimately arrested after punching the victim so hard that she lost her hearing in one ear and her hand was swollen so bad she could no longer move her fingers.[3]

xiii.    On June 1, 2013, a 14-year-old was **statutorily raped** by two adult men at the Motel 6.

xiv.    On July 27, 2013, the FBI MATCH task force conducted an undercover operation at the Motel 6, resulting in the arrest of two adults for **pimping** and one adult for prostitution.

xv.    The next day, on July 28, 2013, the FBI MATCH task force conducted an undercover operation and arrested a woman for **prostitution**.

---

[3] Rodney Thrash, *Warrant: Alleged Pimp Causes Woman to Lose Hearing*, Patch (Jan. 21, 2025, 9:43 AM), https://patch.com/georgia/marietta/warrant-alleged-pimp-causes-woman-to-lose-hearing.

xvi.  On October 26, 2013, a woman called the police, admitted she was a **prostitute**, and informed them that her **pimp** was at the Motel 6 with a "client."

xvii.  On March 26, 2014, a man was robbed at the Motel 6 by two men after attempting to **solicit a prostitute** at the motel.

xviii.  On July 6, 2014, a **missing juvenile** was reported at the Motel 6.

xix.  On August 30, 2014, an undercover police officer in the Motel 6 parking lot was **solicited by a prostitute** who walked up to his car.

xx.  On December 18, 2014, a woman was arrested for **prostitution** during an undercover sting at the Motel 6.

xxi.  On the same day, another woman was arrested for **prostitution** at the Motel 6.

xxii.  On March 23, 2015, a man was arrested at the Motel 6 after being found with drugs and a **naked 16-year-old girl** in the room.

xxiii.  On June 19, 2015, four different women were arrested at the Motel 6 during a **prostitution sting**.

xxiv.  On October 4, 2015, a juvenile reported being **raped** at the Motel 6.

xxv.  On March 19, 2016, a woman reported being **sexually assaulted** at the Motel 6.

xxvi.   On July 24, 2016, police investigated a **sexual battery** involving a minor.

xxvii.   On July 31, 2016, a man was arrested for **sexually abusing a minor** at the Motel 6.

xxviii.   On June 9, 2017, a woman was **sexually assaulted** after noticing three men in a room using cocaine.

xxix.   On July 16, 2017, a woman reported that a man was **pimping** out a female at the Motel 6. The female victim told police that she needed the man's permission to speak with them. The room they were in was found to be full of heroin paraphernalia.

xxx.   On August 22, 2017, a woman reported a **sexual assault** at the Motel 6.

xxxi.   On October 1, 2017, a woman reported she was **raped** at the Motel 6.

57.

These are just documented *sex crimes* at the Motel 6. Of course, there are hundreds of other crimes during this period, from drugs to violence to robberies. These types of prior reported police activity, along with many other examples, all caused or should have caused Defendants to recognize that the motel was frequently being used for the purposes of sex trafficking.

58.

Defendants had actual or constructive knowledge of publicly available online reviews of the Motel 6 reporting prostitution and crime occurring at the motel, including the following:

(i)    June 14, 2012, from foursquare.com:

"Always request the least ghetto part or you will be sure to have early wake up calls from police kicking in some random drug dealers door"

(ii)   September 7, 2013, from expedia.com:

**Dangerous and Horrible**

"This property is completely miss-represented by their online website which contains mostly pictures of a different property across the street. Entire property is not well maintained. Many unsavory people appearing to just hang out and **clear indications of illegal behavior occurring**. . .The only time in my life that I felt I had to flee for my own safety. Property is probably a public safety danger."

(iii)  January 19, 2015, from yelp.com:

"My second night Random people on separate occasions just knocked on my door . . . I did not open the door I just acknowledged them through the door and asked that they needed, at which time I was **asked if I would sell them a 20 of crack** this happened three times in two separate rooms . . ."

(iv)   May 28, 2015, from tripadvisor.com:

"The people staying there looked like **drug dealers and prostitutes** I didn't feel safe AT ALL."

(v)   June 11, 2015, from tripadvisor.com:

"... **the locals know this motel 6 as a place where prostitutes go**. I had to find that out the hard way as I had prostitutes and randoms walking outside my room at 3 in the morning, and yelling and screaming coming from other rooms that didn't sound like normal sex sounds."

(vi)   June 22, 2015, from tripadvisor.com:

"**Prostitutes,crack heads,pimps,and gang bangers** EVERYWHERE!!! AVOID THIS DUMP LIKE THE PLAGUE!! . . . VERY BAD PLACE!!! DO NOT take your family here!!!"

(vii)   April 2016, from tripadvisor.com:

**"Not a place for your family"**

"... On top of all this, partying to where the cops had to sit in the parking lot all night, **Johns and Prostitutes going in and out**, oh ya, a conveience store told me they use a site to mere there 'Johns' there..."

(viii)   June 2016, from tripadvisor:

**Not a hotel it's a drugland**

"My time spent here was mainly me cooped up in my room. Every time I went out a **drug dealer approached me or a pimp**."

(ix)   September 2016, from booking.com:

**Horrible Motel**

"This motel is horrible. [. . .] Shady characters were hanging around. Was in the area for business, but will never stay here again.  Filthy!"

(x)   September 2016, from tripadvisor.com

**Don't stay here.**

24

"Witnessed drug deals outside of our room."

(xi)   <u>October 2016, from tripadvisor.com:</u>

"Walking into the lobby I thought it was nice but once I got to the room the first thing I saw was the cops circling the building and a couple of people just standing outside this was now about 1:30am I get to my room after my friend left me and the first thing I hear is an argument that went on half the night then a **pimp telling his working she need to make her money no matter how cold it was**. [. . .] Next day it was a drug deal next to my room."

(xii)   <u>September 4, 2017, from yelp.com:</u>

"stay the hell away from here !!! please stay away it is a scam you book online and when you get here they say only jacuzzi room available for more money its nasty as hell people live here little boy followed me asking for money with no shoe strings no towels the Indian woman at the front desk is disgusting and hangs out with the people that live here this damn place shouldnt even be open to the public it's not even 1 star"

(xiii)   <u>October 2017, from tripadvisor.com:</u>

"Filthy and scary. People drinking alcohol and doing drugs on the property. I was seriously scared for my safety."

(xiv)   <u>From 2018, from Google reviews:</u>

"There was a room on the ground floor that had questionable activity. A man yelling and cursing at a lady inside the first day. Many different people in and out . . ."

(xv)   <u>From 2018, from Google reviews:</u>

"Also this is a **very bad drug and prostitution Hotel** . . ."

(xvi)   <u>May 27, 2018, from yelp.com:</u>

"Drug dealers run undeterred and **hookers wonder the balcony** at all times of day(not exaggerating)."

(xvii)  August 23, 2018, from yelp.com:

"This motel gets 2 ratings. I would give it a 1 or a 5 depending on what you are looking for. Let's start with the good. **If you are a pimp/drug dealer looking for a place to run your business out of or a broke stoner this place is the place for you.** It's cheap and if you are there to turn tricks you wont even notice the bugs. If you are a broke stoner all you have to do is walk around outside and you will probably get a buzz. If this is you then this place gets a 5 star rating. . . . **There was a guy literally running his prostitution business out of the hotel.**"

(xviii)  October 25, 2018, from booking.com:

**If I hadn't been so exhausted I would've left.**

"This was the worst motel I've ever stayed in . . . There was a wild sex party going on in the room next-door all night. Apparently it's that kind of motel . . ."

(xix)  June 2019, from tripadvisor.com:

**Super filthy run down and unsafe**

"**Drugs, prostitution** . . . Place can be unsafe as people from all walks of life live there and drugs are being run from the hotel. Place frequently gets trashed lost of noises and screams at night. Stay away…"

(xx)  From 2019, from Google Reviews:

"We picked our son up and . . . didn't get back to the room until almost 11:30. The parking lot was full and the balconies was full of people hanging out smoking. Were in the room next to a drug dealer who had people walking past our door all night and talking loud."

(xxi)  From 2019, from Google Reviews:

"ABSOLUTELY HANDS DOWN the WORST hotel ever. As soon as we pulled in thugs EVERYWHERE, people screaming, doors slamming, people dealing drugs out in the open."

(xxii)  From 2019, from Google reviews:

"Definitely a terrible place to stay. I paid for a week stay in advance and they put me and my family in a room on the 3rd floor with a 2.yr old and threatening to kick us out over footsteps…so I go to get a refund and they switched they're rates from the weekly rate I was charged to the day to day rate to take more money than they were supposed to. Meanwhile the drug activity and criminal activities are real. I had a random guy I never met knock on my door and wake my kids asking to buy           drugs.        very         TERRIBLE           STAY!"

(xxiii)  From 2019, from Google reviews:

"When I came back from my event there were about 4 guys on every floor sending each other signals so they can rob people! Then the police was marching around the property all night! Not only that there were visible crackheads with the door open shooting up as if it was a ok."

(xxiv) From 2019, from Google reviews:

"Also, **the amount of prostitution was astounding** for a hotel just off the freeway, in a high traffic area."

(xxv)  From 2019, from Google reviews:

"BED BUGS, ROACHES, PROSTITUTION, DRUGS. The last two are what keeps this place open. You can smell marijuana on every part of the walk to your room, which is honestly the least of the worries here. . . . Lots of people standing around alone or in groups outside after midnight."

(xxvi) From 2020, from Google reviews:

". . . This was the worst motel I ever stayed at. . . . Pure nasty owners. **The owners promote prostitution**. The people that live there hang out in the front of the establishment all evening and night which is bad for business…"

(xxvii) <u>From 2022, from Google reviews:</u>

"If for any reason they determine your stay must end then they will throw you and your belongings into the street immediately. We were told that someone from our room called 911. However, 911 was never called. They said we had to leave immediately. . ."

(xxviii) <u>May 29, 2022, from yelp.com:</u>

"Avoid this place unless you absolutely can't find anything. Most of the "guest" are residents living here . . . The guest were fighting/arguing followed by what sounded like gunshots. And we were only here for two nights…"

(xxix) <u>May 27, 2023, yelp.com:</u>

"While waiting and on the way to the room, I saw **drug and prostitutes**."

(xxx) <u>June 1, 2023, from priceline.com:</u>

"Very loud at night..several uninvited knocks on the door through out the night. **Possible prostitution** could've been in play on a nightly basis."

(xxxi) <u>July 4, 2023, from priceline.com:</u>

". . . very bad experience I called at the property an no one has reached out to me about refunding me nor any accommodations for the terrible experience with a special needs child while ppl outside of the location fighting an holding firearms out."

(xxxii) <u>May 2024, from Google reviews:</u>

"The problem was I was staying below a drug dealer I believe, a lot of traffic all day and night constantly, the whole motel was like that, and yes there was roaches in room. Wasn't happy with stay."

(xxxiii) <u>April 2024, from Google reviews:</u>

   "At midnight, we heard sounds of people fighting and screaming."

(xxxiv) <u>April 2024, from Google reviews:</u>

"Random people knocked on my door at 2 am. The last night we stayed there was a **lady walking around outside naked as a jay bird**."

59.

Defendants knew or should have known that these and other customer reports showing the dangerous nuisance of the property and the rampant crime that occurred on the premises.

## IV.    Defendants' Knowledge of Sex Trafficking Generally

60.

Defendants knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Trafficking Victims Protection Act in 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

61.

Defendants knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that crime was prevalent in the city, including at the Motel 6. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of the largest illegal sex trafficking

economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000.[4] Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendants have received and retained some of those illicit profits through renting motel rooms used for the trafficking of Plaintiff.

62.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[5] and as "the number one city for child sex trafficking."[6]

63.

Defendants knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and

---

[4] See Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM (last visited Jan. 21, 2025); *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 30–32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Jan. 21, 2025).

[5] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month (Jan. 29, 2015), https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Jan. 21, 2025).

[6] *Id.*

30

prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J. and Thomas, J.).

64.

Defendants knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received involving motels and hotels reported sex trafficking, and another 2.6 percent reported a combination of sex and labor trafficking.[7] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[8] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with motels at some point" during their exploitation.[9] Unfortunately, "94 percent" also

---

[7] National Human Trafficking Hotline, *National Hotline Cases Occurring in Motels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://humantraffickinghotline.org/sites/default/files/Motel%20and%20Motel%20 Topical.pdf (last visited Sept. 9, 2021).

[8] Jon Conte et al., *Businesses Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), [https://web.archive.org/web/20210511135432/https://www.bestalliance.org/uploa ds/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf].

[9] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Motels-and-Motels.pdf (last visited Sept. 9, 2024).

"disclosed they never received any assistance, concern, or identification from motel staff."[10]

65.

Defendants knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in or around motels,[11] and that the industry had been warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[12]

66.

Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[13]

---

[10] *Id.* at 23.
[11] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), [https://web.archive.org/web/20191030203754/http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983].
[12] *Id.* at 19.
[13] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited Jan. 21, 2025).

67.

Defendants knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps motels and hotels can take:

(a)   establish corporate policy and procedures against sexual exploitation of children;

(b)   train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

(c)   include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(d)   provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(e)   support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(f)   report annually on the company's implementation of Code-related activities.

68.

Defendants knew or should have known that ECPAT is only one of several high-profile organizations that have for years given motels and hotels the tools to address the scourge of sex trafficking at motels.

69.

Defendants knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help motels and hotels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other motel personnel, to be vigilant in looking for signs of human trafficking at motels and hotels, such as:

(a)   persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(b)   persons who lack freedom of movement or are constantly monitored;

(c)   persons who have no control over or possession of money or ID;

(d)   persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e)   requests for room or housekeeping services (additional towels, new linens, etc.), but denial of motel staff entry into the room;

(f)   the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(g)   extended stay with few or no personal possessions in the room;

(h)   excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

(i)   the same person reserves multiple rooms;

(j)    a room is rented hourly, less than a day, or for an atypical extended stay;

(k)    attempts to sell items to or beg from patrons or staff;

(l)    cars in the parking lot regularly parked backward, so the license plates are not visible; and

(m)    loitering and solicitation of male patrons.

70.

Defendants know full well the danger the motel poses to the surrounding community. Having successfully sold the motel at a large profit, the new developers of the property used the motel's well-known reputation for crime as a justification for the city to approve turning the motel into an apartment building.

71.

The developer's attorney stated in the news and at public meetings, "This is an area that has been challenged. We know this property has an issue with crime and security and do believe that the conversion would help this situation."[14]

72.

The same news report noted that the motel has "a reputation in the community for being the site of criminal activity."[15]

---

[14] Erica Murphy, *This Motel 6 in Marietta could soon be an apartment complex | Why people aren't excited about the idea* (July 7, 2023), https://www.11alive.com/article/news/local/marietta/marietta-proposal-to-turn-motel-6-into-apartments/85-0a694fc0-500a-4d0f-9ca5-fe71817d1272.
[15] *Id.*

73.

The developer's attorney also wrote that "the location of the Property and use has made the Property a frequent location for criminal activity."[16]

74.

Dan Flynn, the former Marietta police chief stated that the Motel 6 "was very problematic. We had a lot of calls involving prostitution, we had a lot of calls involving drugs. And even though they often hired a part-time police officer, that really did not slow it down."[17]

75.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and have sex—sex trafficking would cease to exist. In Plaintiffs' case, Motel 6, for a fee, provided this market for Plaintiffs to be confined and sold.

## COUNT I
## STATUTORY LIABILITY: SEX TRAFFICKING
## 18 U.S.C. § 1595

76.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

---

[16] Hunter Riggall, *Developer proposes converting Marietta motel into apartments* (Apr. 17, 2023), https://www.newsbreak.com/news/2994535324811-developer-proposes-converting-marietta-motel-into-apartments.
[17] *Id.*

77.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture that Defendants knew or should have known engaged in acts in violation of the TVPRA.

78.

Defendants knowingly benefitted from Plaintiffs' sex trafficking by receiving revenue generated by the operation of the Motel 6, including the revenue generated for the rooms in which Plaintiffs were trafficked.

79.

Defendants participated in a motel venture and knew or should have known that their operation of the motel violated the TVPRA by harboring and maintaining Plaintiffs so that they could be sold for sex at the Motel 6.

80.

The venture in which Defendants participated was in or affecting interstate commerce.

81.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives, participated in Plaintiffs' sex trafficking at the Motel 6. Defendants

should have known of this participation.

82.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives knew or should have known of other sex trafficking and sex crimes at the motel before and while Plaintiffs were trafficked for sex at the Motel 6.

83.

Defendants are directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of their agents and representatives.

84.

Plaintiffs have suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' participation in this venture.

85.

Defendants are liable to Plaintiffs for their damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

86.

All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiffs, whose damages were proximately caused

38

by the acts discussed in this count.

## Count II – Nuisance

### 87.

Plaintiffs incorporate the paragraphs above, as if fully set forth herein.

### 88.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

### 89.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

### 90.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

91.

O.C.G.A. § 41-1-4 provides that "A private nuisance may injure either a person or property, or both, and for that injury a right of action accrues to the person who is injured or whose property is damaged."

92.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges[18] shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

**Public Nuisance**

93.

The Motel 6's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

94.

The Motel 6 caused or contributed to a blighting effect on the surrounding

---

[18] O.C.G.A. § 41-3-1 defines "sexually related charges" to mean trafficking a person for sexual servitude, public indecency, prostitution, keeping a place of prostitution, pimping, pandering, or masturbation for hire.

community, so that the Motel 6 negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Motel 6, although the effects on each person may have varied.

95.

The illegal prostitution and sex trafficking nuisance occurring at the Motel 6 had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

96.

The acts and omissions of Defendants in permitting prostitution and sex trafficking at the Motel 6 caused special damages to Plaintiffs, as they were victims of sex trafficking at Defendants' nuisance motel and suffered damages to their health, including mental and emotional harm, pain and suffering, and Defendants are liable to Plaintiffs for all such damages.

**Private Nuisance**

97.

Additionally, or in the alternative, the Motel 6 constituted a private nuisance because its operation at the very least injured the numerous victims of crimes that occurred there, including specifically victims of sex crimes, like Plaintiffs.

41

98.

The Motel 6 created or maintained a continuous or regularly repeated act or condition on the property (of similar past crimes and sex crimes), which caused Plaintiffs' injuries.

99.

Among other things, Plaintiffs' traffickers selected this nuisance motel as a good location to sell Plaintiffs for sex because this motel was known to allow such activity to occur and/or the motel failed to enact any measures to stop such activity from occurring.

100.

Thus, as a direct result of this motel being a nuisance, with a history of many repeated crimes occurring at the property, Plaintiffs were sold for sex at this motel and were harmed and damaged as a result of same.

**Nuisance per se pursuant to O.C.G.A. § 41-3-1**

101.

The Motel 6 constituted a statutory nuisance per se under Georgia law because the motel knowingly and/or negligently turned a blind-eye and permitted illegal sexually related crimes to occur at the motel including rampant prostitution, pandering, pimping, and sex trafficking.

102.

Prior to and following the minor sex trafficking of Plaintiffs, Defendants failed to act on its knowledge of prior prostitution and sex trafficking, and failed to act to correct, prevent, or warn of the prostitution and sex trafficking occurring at the motel, and the dangerous environment created on the property. Defendants' failure to take appropriate action to remedy or reduce the danger to the public, including Plaintiffs, allowed the dangerous environment at the Motel 6 to continue to exist unabated, thereby creating a nuisance that continues to this day.

103.

Plaintiffs were directly harmed as a result of the Motel 6 being a nuisance motel that permitted illegal sexual activity to occur there.

104.

Defendants are liable for nuisance (public nuisance, private nuisance, and/or statutory per se nuisance pursuant to O.C.G.A. § 41-3-1) by reason of its failure to remedy the dangerous condition of prostitution and sex trafficking that persists over a period of time as a continuous and repetitious condition and of which Defendants had express notice and knowledge, and whereby Plaintiffs were direct victims of such activity.

**Count III**
**Statutory Liability: Masha's Law 18 U.S.C. § 2255**
**W.K. and J.T. against all Defendants**

105.

Plaintiffs W.K. and J.T. incorporate the paragraphs above, as if fully set forth herein.

106.

As described above, Defendants directly participated in the minor sex trafficking of J.T. and W.K. by knowingly assisting and facilitating their sex trafficking at the Motel 6 because their staff openly participated in J.T.'s trafficking, *supra* paragraphs 36–37 and W.K.'s trafficking, *supra* paragraphs 42–44. Thus, Defendants committed the predicate offense of a violation of 18 U.S.C. § 1591 as to J.T. and W.K.

107.

J.T. and W.K. were under the age of 18 when they were trafficked at the Motel 6.

108.

J.T. and W.K. were the victims of violations of 18 U.S.C. § 1591 at the Motel 6.

109.

J.T. and W.K. suffered injuries as a result of Defendants' violations of 18

44

U.S.C. § 1591 and 18 U.S.C. § 2255.

110.

Defendants knew or recklessly disregarded that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause J.T. and W.K. to engage in commercial sex acts at the Motel 6.

111.

Defendants knowingly harbored, provided, obtained and maintained J.T. and W.K. at the Motel 6 by providing them and their traffickers rooms in the hotels, extra services, and by acting as lookouts, in and affecting interstate commerce.

112.

Defendants knowingly benefitted financially or by receiving anything of value, from participation in ventures of renting rooms to sex traffickers who violated 18 U.S.C. § 1591 as to J.T. and W.K.

113.

Thus, as described herein, Defendants are jointly and severally liable to W.K. and J.T. for compensatory and punitive damages, in an amount to be determined at trial.

## **DAMAGES**

114.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

45

115.

As a proximate and foreseeable result of Defendants' violations of the TVPRA, Masha's Law, and Georgia law, Plaintiffs sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiffs bring each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiffs seek all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

a) Personal injuries;

b) Past, present and future conscious pain and suffering;

c) Loss of enjoyment of life;

d) Medical expenses;

e) Mental anguish and emotional distress;

f) All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

g) Consequential damages to be proven at trial.

46

116.

Plaintiffs are entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

117.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiffs undue expense. Thus, Plaintiffs are entitled to recover their necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiffs are entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiffs pray for a judgment to be awarded to them and against Defendants for the following:

a)    Process issued as provided by law;

b)    Plaintiffs be awarded actual damages in amounts to be shown at trial from Defendants;

c)      Plaintiffs be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

d)      Plaintiffs be awarded a trial by jury; and

e)      Plaintiffs have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on February 28, 2025.

ANDERSEN, TATE & CARR, P.C.

*/s/ Patrick J. McDonough*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com
*Attorneys for Plaintiffs*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 236-9784| Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing

filing complies with the applicable font type and size requirements and is

formatted in Times New Roman, 14-point font.

Respectfully submitted on February 28, 2025.

ANDERSEN, TATE & CARR, P.C.

*/s/ Patrick J. McDonough*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com
*Attorneys for Plaintiffs*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 236-9784| Facsimile

49